UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

RYAN PARISH,
JOHN STOVER,
KYLE MARTIN,
CHRISTOPHER OQUENDO,
EDGAR ROBINSON,
*on behalf of themselves and all others similarly situated*,

                           Plaintiffs,

   -against-


DuPont Specialty Products USA, LLC,
DuPont de Nemours, Inc.,

                           Defendants.

---------------------------------------------------------------X

Civ. Case No.:1:24-cv-01040-JLS

**<u>FIRST AMENDED</u>**
**<u>CLASS ACTION</u>**
**<u>COMPLAINT</u>**

Trial By Jury Demanded

Plaintiffs Ryan Parish, John Stover, Kyle Martin, Christopher Oquendo, and Edgar Robinson, (collectively "Plaintiffs"), by and through their counsel DEREK SMITH LAW GROUP, PLLC, on behalf of themselves and all other similarly situated employees ("DuPonters"), complain of Defendants DuPont Specialty Products USA, LLC and DuPont de Nemours, Inc. (collectively "DuPont") and do allege, upon information and belief, as follows:

## <u>NATURE OF THE CLAIM</u>

1. For decades, DuPont has maintained a hostile work environment for black DuPonters and has exposed them repeatedly to nooses, apartheid flags, the word "nigger," and other racially motivated abuses on a regular basis.

2. Likewise, DuPont subjects their black employees to disparate treatment in discipline, promotion, and termination.

3. Most harmful are DuPont's promoting practices: black DuPonters will work for decades in the same position while less qualified white DuPonters will be recruited,

recommended, and hired for management positions by a mostly white management team. DuPont's white managers would solicit white laborers to apply for managerial positions almost exclusively, excluding those qualified black employees from even knowing a position was available.

4. Plaintiffs bring this class action lawsuit alleging violations of New York State Human Rights Law ("NYSHRL") on behalf of themselves and all other similarly situated black DuPonters, who currently or formerly were employed by DuPont in Buffalo, New York.

## **PARTIES**

5. At all times material, Ryan Parish is an individual black male. Parish is a former employee of DuPont. Parish worked at DuPont from May of 1998 to October of 2023.

6. At all times material, John Stover is an individual black male. Stover is a former employee of DuPont. Stover worked at DuPont from March of 1997 to 2023.

7. At all times material, Kyle Martin is an individual black male. Martin is a former employee of DuPont. Martin worked at DuPont from January of 1991 to June of 2023.

8. At all times material, Christopher Oquendo is an individual black male. Oquendo is a former employee of DuPont. Oquendo worked at DuPont from 2017 to 2023.

9. At all times material, Edgar Robinson is an individual black male. Robinson is a former employee of DuPont. Robinson worked at DuPont from November of 2015 to March of 2024.

10. At all times material, the above-named Plaintiffs performed their jobs satisfactory, as evidenced by their high achievements, certifications, leadership skills, and years on the job.

11. At all times material, DuPont Specialty Products USA, LLC was and is a foreign limited liability company, duly existing by the virtue and laws of the State of Delaware, and is a registered subsidiary of DuPont De Nemours, Inc.

12. At all times material, DuPont de Nemours, Inc. was and is a publicly traded corporation duly existing by the virtue and laws of the State of Delaware.

13. At all times material, DuPont Specialty Products USA, LLC and DuPont de Nemours, Inc. ("DuPont" or "Defendants") jointly employed Plaintiffs and Class Plaintiffs.

14. At all times material, DuPont operates a facility located at 3115 River Road Buffalo, NY 14207, where all Plaintiffs and Class Plaintiffs worked.

## JURISDICTION AND VENUE

15. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under 42 U.S.C. § 1981.

16. Additionally, this Court has supplemental jurisdiction of the State law causes of action asserted in this action under 28 U.S.C. § 1367.

17. Venue is proper in the Western District of New York under 28 U.S.C. 1391 § (b)-(c) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the Western District of New York.

18. Plaintiffs have complied with all administrative requirements in bringing these claims, to the extent necessary.

## FACT ALLEGATIONS

19. DuPont employs over 24,000 employees in the United States and operates a plant in Buffalo, New York.

20. Black DuPonters in Buffalo have been subject to a hostile work environment based on race for decades. Despite DuPont having knowledge of the prevalent racism and disparate treatment, DuPont has failed to take corrective or remedial action.

21. Upon information and belief, DuPont routinely disciplines black DuPonters more severely than whites (*if* they discipline white DuPonters at all) for the same alleged conduct in their Buffalo plant.

22. Upon information and belief, DuPont routinely hires white DuPonters for management positions in the Buffalo plant while overlooking, not recruiting, and not recommending qualified black DuPonters for the same position. This promotion policy has led to a disproportional amount of black DuPonters being stuck as laborers for decades.

23. At all times material, Defendants' Buffalo plant has settled numerous lawsuits based on race. Despite this, DuPont has failed to take corrective or remedial action and continues to subject black employees to a hostile work environment and discriminatory acts.

*Hostile Work Environment*[1]

24. In or around 1998, Defendants' Supervisor Johnny Gross hung a noose in his office. At all times material, Gross shared his office with multiple supervisors.

25. Upon seeing the noose, Plaintiff Stover asked Defendants' Supervisor Gross whose noose was hanging from his desk. Gross, almost proudly, declared it was his.

26. Despite knowing about the noose, and seeing the noose every day, DuPont's management failed to take any corrective or reasonable action.

27. Despite knowing about the noose, management allowed the noose to hang while every black DuPonter walked by to see it.

---

[1] Sub-headers are for convenience of the reader only. All facts within the "Fact Allegation" section support all causes of action herein.

28. In or around 1998, DuPont's employee Rick Derrick told Junius Hodge ("Hodge") to "**take [his] black ass**," to see a supervisor. At all times material, Derrick used racially demeaning language around black employees.

29. Hodge complained about the racist language. DuPont's management failed to take corrective action.

30. In or around 1998, DuPont's employee Don Davis (white) told Sonya Price (black) he was going to "**string her up**." Davis denied that threatening to "string up" a black person was racist. DuPont did not terminate or discipline Davis.

31. In or around 2007, "**I hate niggers**" was written on a bathroom door in black ink.

32. In response, DuPont had maintenance paint over the racist graffiti. DuPont did not hold a "town hall" meeting to address the graffiti.

33. Upon information and belief, when sensitive issues related to team morale come up at DuPont's Buffalo plant, management would call a "town hall" to have an open discussion with employees. At that time, no "town hall" was called, no investigation was undertaken, and no communication was made to employees regarding the racist graffiti.

34. In or around 2012, **"Niggers go home,"** was scratched into a bathroom stall door. At that point, given DuPont employed a single black plant-manger, a "town hall" was held.

35. In or around 2014, DuPont's supervisor David Yeager rolled up a piece of cardboard paper and hit Plaintiff Parish on the head. Yeager did not treat white employees with such disrespect.

36. In or around 2015, weeks after a racially motivated shooting took place in South Carolina killing numerous black churchgoers, DuPont's employee Karl Zachery began using confederate and apartheid flags:



37. These flags were on display for all DuPont's black employees to see.

38. Thereafter, Plaintiffs' union sought to reinstate the blatantly racist employee who drew the disturbing images.

39. Thereafter, in response to the confederate and apartheid flags, DuPont did not hold a town hall meeting.

40. At one point, in or around 2016, Brooke Nagowski approached Plaintiff Parish and asked him to run for an executive board spot at the union. The reason, according to Nagowski, was that black DuPonters looked at the executive board like a **"Klan rally."**

41. In or around 2017, during negotiations between DuPont management and the union, DuPont's supervisor Freddie Flores and other supervisors drew racist depictions of DuPont's employees and referred to DuPont's union as "Urban Solid Waste". These images were made public and circulated on different news outlet.

42. On or about May 14, 2022, days after the horrific, racially motivated shooting in Buffalo at Tops Friendly Markets, DuPont's employee Jim Dolan (white) found a noose on Jessie William's (black) toolbox:



43. DuPont did not call a town-meeting and did not have any follow up discussions with their employees regarding the noose.

44. Thereafter, black DuPonters approached DuPont's Human Resources and sought *some* response from DuPont. In response, DuPont sought to hold a meeting regarding "respecting" other employees—not racial discrimination in the workplace.

45. At all times material, all Plaintiffs herein were exposed to the word "nigger" written on the walls at DuPont (repeatedly), nooses being hung, confederate flags being drawn, apartheid flags being drawn, and other racially insensitive language and actions.

46. The above are just some examples of the on-going hostilities black DuPonters, and Plaintiffs, are subject to on a regular basis. (Other examples being, but not limited to, the words "**Niggers do the work"** written on boxes, telling black employees to drink Hennessey, DuPont's employee Ray Fields [white] writing "**let the niggers do [the work],**" and other discriminatory remarks).

***Disparate Treatment in Conditions of Employment, Promotion, and Discipline & Disparate Impact***

47. At all times material, black employees make up approximately15-18% of DuPont's non-managerial employees in Buffalo (while making up closer to 1% of DuPont's managerial employees).

48. Despite this, DuPont for decades has disciplined, terminated, and failed to promote black employees disproportionately in comparison to their white counterparts.

49. At all times material, DuPont hires mostly white managers at their Buffalo plant.

50. At all times material, DuPont's white mangers discipline and terminate black DuPonters at a higher rate than their white counter parts.

51. From in or around 2002 to 2016, the union executive board was all-white. This made it more difficult for black DuPonters to have adequate representation in appealing adverse employment actions.

52. In or around 2007 and thereafter, DuPont routinely did not hold "town halls" for racially sensitive events (such as a noose hanging, or the word "nigger" painted on a bathroom stall) yet held town halls for other reasons.

53. In or around 2011, Paul Baase, a white employee, spit in Plaintiff Stover's face. Despite being the victim, DuPont put Stover on probation. Similar white employees who are the

"perpetrators" in altercations are rarely, if at all, disciplined compared to their black co-workers.

54. In or around 2014 onward, DuPont's manager David Yeager began to subject black DuPonters to disparate treatment. For example, despite his white employees being late to work, Yeager would not discipline them. By contrast, when Plaintiff Parish was late due to a massive storm that caused a city-wide power outrage, Yeager punished Plaintiff Parish.

55. Likewise, in or around 2014, Plaintiff Parish requested to use an emergency vacation day (Parish needed to drive his mother to receive chemotherapy, as her car wasn't working). Parish got approval from Defendants' Supervisor Ron Hastings. The next day, Yeager told Plaintiff that he would be written up for taking an emergency day. Yeager did not discipline white co-workers who had to take emergency days.

56. Upon information and belief, Yeager and other managers approved vacation days, time-off, and allowed white employees to be late without punishment far more than their black counterparts.

57. In or around 2020, Lazhaun Moore, a black employee, was forced to leave the job after a COVID exposure scare. Moore notified DuPont. Upon returning to the job, DuPont issued Moore a "last chance agreement." Other white individuals have walked off the job without being subject to a last chance agreement or any discipline whatsoever.

58. In or around 2021, DuPont punished Darryl Harris, a black employee, because Rick Walters, a white employee, didn't like the way Harris responded to a question and felt intimidated. Despite multiple witnesses informing DuPont that Harris did nothing wrong,

DuPont went out of their way to protect their fragile white employee from the stereotypical "angry black" employee.

59. Through 2021 to 2024, two white employees, John Atkinson and John Himes, both quit working for DuPont. Despite affirmatively quitting and, in one case, agreeing to employment elsewhere, DuPont allowed both Atkinson and Himes to return to work for them. By contrast, Tremoni Lattimore, a black employee, put in his two weeks' notice. During his notice period, he changed his mind. DuPont, in sum and substance, told Lattimore he was not hirable and not welcomed back.[2]

60. Additionally, DuPont shows little respect for black bodies in their Buffalo plant compared to white employees.

61. For example, in or around December of 2022, Tim McCrae Jr., a black DuPonter, burnt himself at the plant off steam.

62. At all times material, it is standard practice for the plant to shut down after a serious injury.

63. In response to McCrae's injury, Defendants (i) did not shut down the plant, (ii) refused to allow McCrae to go home and heal, and (iii) administered ointment on his burn without medical staff physically present (specifically, Supervisor Ken Christi administered the ointment without consulting medical staff).

64. Mere **_hours later_**, a white DuPonter burnt himself on steam. DuPont commenced a shut down immediately, allowed the white DuPonter to go home, and had all relevant employees come in for a safety meeting. Additionally, DuPont provided the white DuPonter actual, in-person medical attention.

---

[2] By way of further example, in or around 2012-2016, a white employee was convicted of drug trafficking. After his prison sentence, DuPont rehired him and thereafter _promoted_ him.

65. Plaintiffs complained regarding this overt disparate treatment. DuPont took no corrective or remedial measures.

66. In or around 2023, Plaintiff Stover was changing filters. Stover was changing filters in the same manner he had for the last 15 years of employment.

67. While cleaning, a white employee, JoAnna Petito complained she was "engulfed in dust" (despite everyone of Stover's present co-workers not complaining about dust) to Defendants' Supervisor Phil Budzinski.

68. Budzinski, as if lecturing a young child, told Stover to apologize to Petitio. Plaintiff was confused; the supervisor assigned him the filter-cleaning project, the supervisor did not tell anyone to wear a mask, and it was the supervisor's job to settle these kinds of disputes among the employees. Despite this, Stover agreed to talk to Ms. Petitio. Stover then had a conversation with Petitio. Ms. Petitio raised her voice to Plaintiff.

69. Despite both individuals having a conversation at a supervisor's direction, 3 days later DuPont suspended Plaintiff Stover while they "investigated" the conversation between Plaintiff and Petitio. Defendant did not suspend Petitio.

70. Three days later, DuPont terminated Plaintiff Stover. DuPont did not suspend or terminate Petitio.

71. At all times material, Plaintiff Stover—around the time of his unlawful termination—was being promoted to Temporary First Line Supervisor. After being terminated, that position was given to a white male with less experience than Plaintiff Stover.

72. By contrast to the above, Bobby Reynolds, a white employee, asked Plaintiff Kyle Martin, a black employee, if Martin "**wants to live**." Despite making this threat, DuPont did not terminate Reynolds.

73. By further contrast, when DuPont's employee Ray Fields (white) wrote "let the niggers do [the work]" he was not terminated.

74. In or around 2022, DuPont forced Manager Milton Gage, one of the few black managers, to resign despite him having the highest output in the Buffalo factory. Thereafter, Gage was replaced with a white plant manager.

75. In or around 2022, DuPont punished Mike Sanford, a black employee, by giving him probation for taking FMLA. By contrast, Bobby Reynolds, a white employee, received "coaching" for being a no-call-no-show multiple time. This type of favorable treatment has been the norm at DuPont for decades.

76. Repeatedly, white employees sleep on the job with no to little consequences:



77. By contrast, black employees, for the same behavior are disciplined more severely.

78. By way of further example, DuPont immediately asked Supervisor Doug Reynolds (white) to retire after accusations of sexual harassment were made by Candy Strom (white) against him. DuPont did not demand Strom provide witnesses. By contrast, when Tashawn Williams (black) made accusations against Supervisor Aaron Atkinson (white), DuPont forced the accused and accuser to work together and demanded Williams provide witnesses.

79. On or about October of 2023, Plaintiff Robinson took 6 months to treat his stage 4 cancer (as per his doctor's recommendation).

80. In response to Plaintiff Robinson seeking to take over 6 months to heal, DuPont terminated him.

81. In comparison, in or around 2021, a DuPont white employee had cancer and took over 6 months to heal. DuPont did not terminate him.

82. For decades, DuPont has punished black employees more severely than white employees for the same conduct.

83. DuPont's Buffalo plant has settled numerous discrimination lawsuits throughout the decades. In response, DuPont continues to fail to provide black employees with equal treatment and a hostile free work environment.

84. DuPont's unlawful disciplinary system is due in part to DuPont's mostly white managers and DuPont's promotional policies in Buffalo.

85. At all times material, DuPont hires white employees for supervisor roles far more than the black employees. This has been occurring for decades up and until present day.

86. At all times material, DuPont's policy for promoting laborers to managers involves white managers soliciting, encouraging, and assisting white laborers to apply to managerial positions, while excluding black laborers.

87.  This exclusionary practice has caused black DuPonters to be stuck in the same non-managerial roles for decades.

88. DuPont's hiring policy in Buffalo involves a white manager directly approaching a white laborer and soliciting, encouraging, or recommending that the white laborer apply for a managerial position. The white manager would explain to the white laborer how and when to apply. This information would not be shared with black laborers. Then, in turn, that white applicant would be hired, per the white manager's recommendation.

89. This policy has contributed to a low number of internal black employees at DuPont applying for and receiving managerial positions.

90. DuPont is aware of the low-to-no black applicants for managerial positions throughout the decades but has never stopped to ask *why* nor taken corrective action to help change their internal policy.

91. Historically, DuPont's discriminatory promotional policies have led to less qualified white individuals being placed in managerial roles. For instance, Plaintiff Stover has trained multiple white DuPont employees who, after working at DuPont for 1/16[th] of the time Stover has worked at DuPont, are hired as managers to directly manage Stover—the individual who trained them. As a further example, in or around 2018, Plaintiff Parish asked DuPont's supervisor Freddy Flores if Parish could apply for a supervisory role. Flores told Parish that Parish could not as he did not have "wet end" experience.[3] Months

---

[3] "Wet end" means the section of DuPont's Buffalo plant that deals with large quantities of chemicals.

later, DuPont's white employee Aaron Atkinson was promoted to a managerial position despite him having 15 years less experience than Parish and no "wet end" experience whatsoever. By way of further example, white laborers are often brought in, some with degrees in physical education, they work for 2 years without gaining any specific certifications or credentials, and then they are promoted to managerial positions over well qualified black laborers. Meanwhile, DuPont has failed to even tell qualified black laborers that a vacancy for a managerial position was open. By way of further example, Grady Lofton, a qualified black operator, has never received a promotion, while his white, less-qualified counterparts have. The decision to hire white employees over well qualified black employees was routine.

92. Further examples of underqualified whites being approached and hired for managerial positions, while overqualified blacks were never informed, recruited, or encouraged to apply include but are not limited it: (i) After being hired in 2018—and therefore having far less experience than the named Plaintiffs—Steve Gunnerson was made a temporary supervisory in 2021 then promoted to technical advisor (i.e. a manager) in 2022. Plaintiffs were more than qualified for Gunnerson's role but they were not recruited for the position, despite having the expertise; (ii) Aaron Atkinson was hired in 2016 yet became a manager in 2021. Again, all named Plaintiffs were qualified for the managerial position, but they were not recruited for the position, despite having the expertise; (iii) Bobby Trimper was hired in 2016 and received a managerial position to run DuPont's plant in 2021 despite limited experience (as compared to Plaintiffs) and only holding an associate's degree in landscaping. Again, all named Plaintiffs were qualified for the supervisory position, but they were not recruited for the position, despite having the

expertise; (iv) Phil Budzinski was hired in 2010 yet became a manager 2023, while the named Plaintiffs had decades more experience than him and were overqualified for the position. Once again, no one notified Plaintiffs of the position. Instead, DuPont's management specifically recruited a white employee, Budzinski.; (v) Keith Rodgers was hired in 2010 and became a unit manager in 2022. At the time of promotion, Rodgers had a degree in physical education and had far less experience than the named Plaintiffs; (vi) Dan Audy was hired in 2017 then became a technical advisor in 2022, which is a promotion over a supervisor; and (vii) Pat Hagerty likewise worked for DuPont for far fewer years (hired in 2016) compared to Plaintiffs yet was promoted to a managerial role in 2020. Despite Plaintiffs all being overly qualified for the position, no one at DuPont ever solicited, encouraged, or told them about the vacant positions.

93. At all times material, the above named white DuPonters who were approached for and received managerial positions worked the same labor-based jobs as Plaintiffs.

94. The above are just some examples of DuPont refusing to recruit from a pool of overqualified black employees—some whom have worked for DuPont decades longer than their white counterparts, have every training required, and know the plant like the back-of-their-hand—and instead purposefully recruiting underqualified white employees.

95. Sometime in the 2000s, DuPont established a portal to post vacant managerial positions. The portal was accessible through a few kiosks scattered around the plant (most of which were broken). Despite the seemingly neutral way for applicants to apply, in practice, the same discriminatory promotional policies stayed in place.

96. While DuPont had a portal that, in theory, anyone could access, this did not curb the hand-picking-white-managerial-practices at DuPont.

97. For starters, DuPont's Buffalo plant has a bulletin board that employees walk by daily. DuPont would routinely post vacant positions on the bulletin board. But DuPont would only post *non*-managerial positions on the bulletin board in the Buffalo plant. Therefore, DuPont's black laborers had no way of knowing if a vacancy was available unless they regularly accessed the portal.

98. Additionally, DuPont never trained, set up laborers with credentials to access, or discussed how to access the portal which listed the managerial positions.

99. Therefore, white managers would still hand select white laborers for managerial positions, then tell those prospects how to apply via the portal.

100.    At all times material, white managers would let white laborers know before a position would be posted in the portal so white laborers could apply first. White managers would rarely solicit applications from black DuPonters.

101.    Even with the portal, there would be low-to-no internal black applicants for decades for managerial positions at Buffalo. Despite knowing about these low applications from black employees and their policy of handpicking white managers, DuPont failed to correct, investigate, or take any remedial action.

102.    At all times material, even if a black laborer somehow caught wind of a vacant managerial position and applied, DuPont implement a test that disproportionality impacted prospective black managers.

103.    For instance, Plaintiff Stover, over a 15-year period, made attempts to apply for a managerial position. DuPont required Stover to take a "managerial test."

104.     The "managerial test" asked questions like, "*do you like to box?*" and "*do you like to read?*" and questions about personality traits like "*are you an aggressive or passive person?*"

105.     In addition, **the test specifically asked for the takers' race.**

106.     Plaintiff Stover "failed" this test 3-4 times in a 15-year period while less qualified white applicants somehow "passed."

107.     The last time Plaintiff Stover "failed" this test was 2023.

108.     Each time Plaintiff Stover failed he would ask DuPont's Head of Human Resources how he could possibly "fail" what amounted to a personality test with a racial identification question. DuPont never provided Stover feedback on how he could "pass."

109.     Given the "managerial test" had nothing to do with technical abilities, ability to manage the actual Buffalo plant, understanding of the lines in the plant, understanding of the computer systems used in the plant, or anything actually related to work—all of which, objectively, Plaintiffs would have outperformed any other applicant—the test was either i) flawed in that it disproportionately harms black test takers or ii) DuPont was using race as a criteria for whether the individual passed or failed the "managerial test."

110.     To sum: DuPont has a system of hand selecting white managers and, to the extent black employees attempt to apply for managerial position, DuPont has in place a test that disproportionately impacts black individuals.

111.     Plaintiff Stover has never been approached by a white manager and encouraged to apply for a managerial position.

112.     Plaintiff Parish has never been approached by a white manager and encourage to apply for a managerial position.

113.    At all times material, all Plaintiffs have worked for DuPont while less qualified white DuPonters have received promotions through white managers recruiting them.

114.    At all times material, DuPont has known about racial disparities and segregated working conditions yet has failed to take corrective or remedial measures.[4]

115.    The impact of DuPont's policy of hiring mostly white managers who discipline black DuPonter's at an alarmingly higher rate than their white counter parts, the impact of DuPont's policy to not hire black DuPonter's for managerial positions while hiring less-qualified white employees, and the impact of DuPont's indifference to the above conduct shows an intent to maintain a segregated factory; one in which black DuPonter's are treated less favorably than their white counter-parts.

116.    The above are just some examples of the disparate conduct Plaintiffs and black DuPonters have been subjected to.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this Class Action pursuant to Article 9 of the CPLR seeking monetary, injunctive, and declaratory relief on behalf of (1) all individuals who identify as black employed by DuPont in their Buffalo plant in non-management roles from January 1998 until the resolution of this action who were exposed to the hostile work environment created and maintained by DuPont ("**HWE Class**"); (2) all individuals who identify as black employed by DuPont in their Buffalo plant in a non-management roles from January 1998 until the resolution of this action who were subject to any adverse employment actions ("**DT Class**") and; (3) all individuals who identify as black

---

[4] If one were to walk into the Buffalo factory during a break, you would see the black DuPonters sitting with one another at a table and the white DuPonters sitting at another table.

employed by DuPont in their Buffalo plant in a non-management roles from January 1998 until the resolution of this action who never worked in a managerial role or who did not receive promotions to managerial roles after applying or taking any managerial test ("**DI Class"**). All said persons, including Plaintiffs, are referred to herein as the Classes.

118.    Plaintiffs are members of the Classes they seek to represent.

119.    The members of each Class identified herein are so numerous that joinder of all members is impracticable. Although Plaintiffs do not know the precise number of Class Members, the number is far greater than can be feasibly addressed through joinder.

120.    There are questions of law and fact common to each Class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

(a) Whether DuPont's policies and practices discriminate against Class Members regarding the terms, conditions, and privileges of employment;

(b) Whether DuPont maintains a policy in which black employeesare rarely promoted to managerial positions;

(c) Whether DuPont maintains a policy in which whites in management handpick other whites in managerial positions;

(d) Whether DuPont used race as a factor in their "managerial test";

(e) Whether DuPont affords the same privileges of employment to black employees as they do to white employees;

(f) Whether DuPont disproportionately disciplines black employees compared to similarly situated white employees;

(g) Whether DuPont maintains a hostile work environment for black employees;

(h) Whether DuPont has failed to take remedial actions to address the on-going hostile work environment;

(i)  Whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Classes are warranted.

121.    Plaintiffs' claims are typical of the claims of the Classes they seek to represent.

122.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

123.    Class certification is appropriate because DuPont has acted and/or refused to act on grounds generally applicable to the Classes, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Classes they seek to represent. The Class Members are entitled to injunctive relief to end DuPont's common, uniform, unfair, and discriminatory policies and practices.

124.    Class certification is also appropriate because common questions of fact and law predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Plaintiffs and the Class Members have been damaged and are entitled to recovery as a result of DuPont's common, uniform, unfair, and discriminatory policies and practices. DuPont has computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class Members relatively simple. The propriety and amount of punitive damages are based on DuPont's conduct, making these issues common to the Classes.

125.    In the alternative, should these classes be denied certification, Plaintiffs request leave to amend this complaint to assert their own, individual actions.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Disparate Treatment Discrimination
### NYSHRL
### (On Behalf of Plaintiffs and the DT Classes)

126.    Plaintiffs incorporate by reference the preceding paragraphs as alleged above.

127.    New York State Executive Law § 296 provides that: "1. It shall be an unlawful

discriminatory practice: "(a) For an employer or licensing agency, because of an

individual's age, race, creed, color, national origin, sexual orientation, military status, sex,

disability, predisposing genetic characteristics, familial status, marital status, or domestic

violence victim status, to refuse to hire or employ or to bar or to discharge from

employment such individual or to discriminate against such individual in compensation

or in terms, conditions or privileges of employment."

128.    Terms, conditions, and privileges of employment at DuPont are different for black

employees than whites.

129.    This Claim for Relief is brought by Plaintiffs on behalf of themselves and the DT

Class.

130.    DuPont has engaged in an intentional, company-wide, and systematic pattern or

practice of discrimination against black DuPonters. The discriminatory acts that

constitute DuPont's pattern or practice of discrimination occurred both within and outside

the liability period in this case. DuPont has intentionally discriminated against Plaintiffs

and the Classes in violation of the NYSHRL by, among other things:

a)  implementing company-wide policies and practices that disproportionately discipline
    and terminate black DuPonters compared to white DuPonters. This includes
    subjecting black DuPonters to termination, write-ups, and other adverse employment
    actions, while not subjecting white DuPonters to discipline for the same or similar
    conduct;

b) Allowing mangers to make decisions regarding termination in a way that disparately impacts black employees;

c) Allowing a mostly all-white management force to recommend and recruit underqualified white workers for managerial positions and adopting the mostly white-management's recommendations for hire, thereby suppressing black upward mobility at DuPont;

d) Directly soliciting, encouraging, and recruiting from a white-work force to apply to managerial positions while excluding black employees;

e) Facilitating an examination that disproportionately impacts black test takers for managerial positions;

f) Taking race into consideration when screening applicants for supervisory roles;

g) Failing and refusing to take reasonable and adequate steps to prevent and correct disparate treatment in discipling and terminating black DuPonters.

131.    DuPont's discriminatory policies or practices described above have denied black DuPonters business opportunities and compensation, in the form of lost past and future wages and other job benefits, as compared to similarly situated white DuPonters.

132.    DuPont has set and/or maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period within New York State, and the discriminatory policies, patterns, and/or practices have had a discriminatory on black DuPonters within New York State.

133.    As a direct result of DuPont's discriminatory policies and/or practices as described above, Plaintiffs and the Classes have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

134.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by New York State Executive Law § 296

135.    Plaintiffs request relief as hereinafter described.

**SECOND CAUSE OF ACTION**
**Hostile Work Environment**
**NYSHRL**
**(On Behalf of Plaintiffs and the HWE Class)**

136.    Plaintiffs incorporate by reference the preceding paragraphs as alleged above.

137.    New York State Executive Law § 296 provides that: "1. It shall be an unlawful

discriminatory practice: "(a) For an employer or licensing agency, because of an

individual's age, race, creed, color, national origin, sexual orientation, military status, sex,

disability, predisposing genetic characteristics, familial status, marital status, or domestic

violence victim status, to refuse to hire or employ or to bar or to discharge from

employment such individual or to discriminate against such individual in compensation

or in terms, conditions or privileges of employment."

138.    DuPont's black employees are continuously subjected to a hostile work

environment based on race. As articulated above, Defendants' maintain a work

environment where "nigger" is written on the walls and work-area, nooses are free to

hang off equipment, symbols of racism (confederate flag, apartheid flag) are hung freely,

and Black employees are subjected to degrading language and behavior.

139.    DuPont has maintained, fostered, and failed to take corrective action throughout

the decades, culminating in the same issues for DuPont's black employees.

140.    DuPont has intentionally discriminated against Plaintiffs and the Classes in

violation of the NYSHRL by, among other things:

a)  Maintaining hostile working conditions for black employees;

b)  Failing to prevent disturbing acts of racism;

c)  Failing to train management and employees to combat racism in the workplace;

d) Failing to take meaningful remedial or correction action in light of racist behavior in the workplace.

141.    DuPont has set and/or maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period within New York State, and the discriminatory policies, patterns, and/or practices have had a discriminatory on black DuPonters within New York State.

142.    As a direct result of DuPont's discriminatory policies and/or practices as described above, Plaintiffs and the Classes have suffered damages including, but not limited to, emotional distress damages.

143.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by New York State Executive Law § 296.

144.    Plaintiffs request relief as hereinafter described.

**THIRD CAUSE OF ACTION**
**Disparate Impact Discrimination**
**NYSHRL**
**(On Behalf of Plaintiffs and the DI Classes)**

145.    Plaintiffs incorporate by reference the preceding paragraphs as alleged above.

146.    This Claim for Relief is brought by Plaintiffs on behalf of themselves and the DI Classes.

147.    DuPont's reliance on hand-picked management applications leads to low-to-no black applicants for managerial positions, keeps black employees in a subservient role at DuPont, and inhibits black upward mobility at DuPont and, therefore, the greater Buffalo area.

148.    DuPont's reliance on a managerial test that takes into account race disproportionality impacts black applications in an adverse way.

149.      DuPont's policies cannot be justified by any legitimate business necessity. Even if such systems and/or policies could be justified by business necessity, less discriminatory alternatives exist that would equally serve any alleged necessity.

150.      DuPont has maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case, and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on members of the Classes within New York State.

151.      As a direct result of DuPont's discriminatory policies and/or practices as described above, Plaintiffs and the Classes have suffered damages including, but not limited to, lost past and future income, compensation, benefits, and the convenience of working a managerial shift (typically set for 7 AM to 3 PM).

152.      The foregoing policies, patterns, and/or practices have an unlawful disparate impact on black employees in violations of NYSHRL.

153.      Plaintiffs request relief as hereinafter described.

**FOURTH CAUSE OF ACTION**
**RACE DISCRIMINATION – 1981**
**(ON BEHALF OF DI Classes)**

154.      Plaintiffs incorporate by reference the preceding paragraphs as alleged above.

155.      Plaintiffs' races (identifying as Black) was a motivating factor in the Defendants' discriminatory treatment regarding the terms and conditions of employment. The unlawful employment practices in this complaint were done with malice or reckless indifference to the protected rights of the Plaintiffs and class members.

156.      Defendants have violated Plaintiffs' and the DI Classes' rights by depriving them of their right to enjoyment of all benefits, privileges, terms, and conditions of their

employment contract "as is enjoyed by white citizens." Specifically, Defendants' policy

of soliciting white applicants for managerial positions and excluding Black DuPonter's

for managerial positions, along with implementing a test based on race, has changed the

terms and conditions of all Black DuPonter's in a non-managerial position.

157.     Defendants have failed to acknowledge Plaintiffs' and Class Plaintiffs' civil rights

by continuing the employment of those who enabled and encouraged discriminatory

treatment and hostile work environments.

158.     As a result of Defendants' violations of law, Plaintiffs and Class Plaintiffs' have

suffered and will continue to suffer economic and noneconomic harms.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs and the Classes pray for relief as follows:**

(a) Certification of the case as a class action brought on behalf of the proposed Classes;

(b) Designation of Plaintiffs as respective representatives of the Classes;

(c) Designation of Plaintiffs' counsel of record as Class Counsel;

(d) Certification of this action on behalf of Plaintiffs; designation of Plaintiffs PARISH, STOVER, MARTIN, OQUENDO, and ROBISON as the representatives of the Collective; prompt issuance of notice to all similarly-situated members of the Proposed Classes, which apprises them of the pendency of this action; and tolling of the statute of limitations on the claims of all members of the Proposed Classes from the date the original Complaint was filed until the Proposed Classes are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right;

(e) Back pay (including interest and benefits) and front pay for Plaintiffs and Class Members;

(f) All damages sustained as a result of DuPont's conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

(g) Liquidated damages;

(h) Exemplary and punitive damages in an amount commensurate with DuPont's ability to pay and to deter future conduct;

(i) Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(j) Declaratory Judgment, in which DuPont is ordered to rectify for their years of disparate treatment, discriminatory hiring, and failures to take corrective action;

(k) Pre-judgment and post-judgment interest, as provided by law; and

(l) Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all questions of fact raised in this Complaint.

Date:    December 13, 2024
New York, New York

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**

***/s/ Alexander G. Cabeceiras***
Alexander G. Cabeceiras, Esq.